**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 3 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

RICHARD S. DEMAREST,

      Petitioner-Appellee,

v.

WILLIAM PRICE; GALE NORTON,
Attorney General of the State of Colorado,

      Respondents-Appellants.

No. 95-1535

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 91-N-827)

---

Robert Mark Russel, First Assistant Attorney General, Chief, Criminal Enforcement
Section, Gale A. Norton, Colorado Attorney General, with him on the brief, Denver,
Colorado, for Respondents-Appellants

Vicki Mandell-King; Assistant Public Defender, Chief, Appellate Division; Michael G.
Katz, Federal Public Defender, with her on the brief, Denver, Colorado, for Petitioner-
Appellee

---

Before HENRY, MURPHY, and RONEY[*], Circuit Judges.

---

HENRY, Circuit Judge.

---

      [*]      The Honorable Paul H. Roney, Senior Circuit Judge for the Eleventh Circuit
sitting by designation.

Respondents William Price and Gale Norton[1] appeal the district court's order granting Richard Demarest's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and vacating his conviction for first degree murder in Jefferson County, Colorado. See Demarest v. Price, 905 F. Supp. 1432 (D. Colo. 1995). The district court concluded that by failing to adequately investigate the case, interview witnesses, and present medical evidence, Mr. Demarest's attorney in the Jefferson County murder trial deprived him of his Sixth Amendment right to effective assistance of counsel. See id. at 1446-54. Respondents argue on appeal that Mr. Demarest may not seek redress in federal court because he did not exhaust his state court remedies in that he did not fairly present important evidence regarding his trial counsel's performance to the Colorado state courts.

Initially, we conclude that the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), that amend the habeas corpus statutes should not be applied to this case because Mr. Demarest's petition was filed before the AEDPA's effective date. See Lindh v. Murphy, 117 S. Ct. 2059, 2068 (1997). Then, applying the pre-AEDPA habeas corpus provisions, we hold that Mr. Demarest did not exhaust his state remedies. We therefore vacate the district court's order granting Mr. Demarest's petition and remand the case to the district court for several determinations.

---

[1]     We refer to respondents collectively as "the state."

On remand, we direct the district court to first determine whether Mr. Demarest's ineffective assistance of counsel claim, based on the new evidence presented at the federal evidentiary hearing, would now be procedurally barred under Colorado law. In the event that the district court concludes that Mr. Demarest's claim would not now be procedurally barred, we hold, it should dismiss the claim without prejudice so that it may now be adjudicated in the Colorado courts. Alternatively, if the district court concludes that Mr. Demarest's claim would now be procedurally barred in the Colorado courts, it should then determine whether Mr. Demarest can establish either that there was cause for the default and prejudice resulting from the violation of federal law, or that failure to consider his claim on the merits would result in a fundamental miscarriage of justice. In the event that Mr. Demarest establishes either cause and prejudice or a fundamental miscarriage of justice, the court should proceed to the merits.

## I. BACKGROUND

Early in the afternoon of February 9, 1981, petitioner Demarest called the Jefferson County Sheriff's Department from a neighbor's home and reported that he had just discovered the body of his friend Ronald Hyams in the house that the two shared in Evergreen, Colorado. "In a panicked, sobbing voice," Demarest, 905 F. Supp at 1436, Mr. Demarest told the emergency operator that it appeared that Mr. Hyams had been murdered. After placing the call, Mr. Demarest ran back to his house and sat down under

a tree in the front yard next to a gravel driveway, where a neighbor waited with him for law enforcement officials to arrive.

Approximately ten minutes after Mr. Demarest's call, Jefferson County deputy sheriffs discovered Mr. Hyams's body in a downstairs bedroom. Mr. Hyams's head was wrapped in a bathrobe and there were puncture wounds around his neck and collarbone. The pathologist who conducted the autopsy testified that Mr. Hyams died from "the combined effects of trauma to the head[,] . . . blood loss from the stab wound in the left neck[,] and from the complication of strangulation of the neck." Id. (quoting Rec. vol. V, Trial Tr. of State v. Demarest, No. 81 CR 259, Jefferson County District Court, at 638).

During the period immediately after Mr. Hyams's murder, Mr. Demarest experienced substantial emotional trauma and required psychiatric treatment. On the day of the murder, a neighbor testified, Mr. Demarest was distraught and in shock. As a result, medical personnel took him to a local emergency room. Carol Lee Held, Mr. Demarest's other housemate, took him home later that day, but she observed that Mr. Demarest soon grew unresponsive and appeared to fall into a trance. Ms. Held called the sheriff's office for assistance, and when the deputies arrived, they found Mr. Demarest "lying on the floor in a fetal position, tightening his muscles, and clenching his fists." Id. at 1436 (citing Trial Tr. of State v. Demarest, No. 81 CR 259, Jefferson County District Court, at 289-90). The deputies took Mr. Demarest back to the local medical center, and

he was then transferred to the psychiatric ward of another hospital. A psychiatrist diagnosed him as suffering from adult situational reaction caused by acute stress and treated him with a variety of drugs. Mr. Demarest was released from the psychiatric ward on February 11, 1981.

During an interrogation at the sheriff's office on February 12, 1981, Mr. Demarest suffered another breakdown. When shown a picture of Mr. Hyams, he began shaking, fell on the floor, and curled into a fetal position. Mr. Demarest was taken back to the hospital's psychiatric ward, where he remained until February 23, 1981. Another psychiatrist concluded that he suffered from an "adult situational disorder with withdrawal[,]" see id. at 1437, and treated him with prescription drugs.

On the three separate occasions shortly after the murder when deputies questioned him, Mr. Demarest denied any involvement in Mr. Hyams's murder. He reported that on the morning of the murder, he had borrowed Mr. Hyams's car, stopped at a McDonald's restaurant to drink coffee, and had then driven to Mr. Hyams's dentist's office to pick him up after an appointment. When he arrived at the dentist's office, he learned that Mr. Hyams had missed the appointment. According to Mr. Demarest, he then returned home and discovered the body.

During the questioning, deputies observed that Mr. Demarest had scratches on the back of his hands and face. When asked about the scratches, Mr. Demarest said that he had pounded his fists into the gravel driveway while waiting for emergency personnel

after discovering Mr. Hyams's body. As to his face, Mr. Demarest said that he had scratched it at the medical center on the afternoon of the murder.

In March 1981, the Jefferson County District Attorney charged Mr. Demarest with the murder of Ronald Hyams. The Jefferson County District Court appointed a state public defender as Mr. Demarest's counsel. The public defender represented Mr. Demarest until June 29, 1981, when Mr. Demarest retained William A. Cohan, who served as his defense attorney throughout the trial.

The Jefferson County District Court conducted Mr. Demarest's trial in October 1981. The prosecution contended that the following events occurred on the morning of February 9, 1981: Mr. Demarest struck Mr. Hyams's head from behind and bludgeoned his face; Mr. Hyams struggled and scratched Mr. Demarest's hands and face; Mr. Demarest eventually managed to subdue Mr. Hyams; and, after Mr. Hyams had passed out, Mr. Demarest deliberated for ten to fifteen minutes and then killed Mr. Hyams by stabbing and strangling him. Next, according to the prosecution's theory, Mr. Demarest drove to the dentist's office to establish an alibi. Mr. Demarest's apparent shock upon discovering Mr. Hyams's body, the prosecution suggested, was a contrived reaction intended to divert suspicion.

At trial, the district attorney offered scientific and forensic evidence to support this theory. Dick Hopkins, a detective with the Arapaho County Sheriff's Department whom the court allowed to testify as an expert in blood-spatter analysis, testified that the pattern

of blood stains at the murder scene indicated that Mr. Hyams was murdered by a tall, strong right-handed man. Detective Hopkins also testified that the scratches on Mr. Demarest's hands appeared to come from fingernails and that the blood stains at the murder scene indicated that about ten to fifteen minutes had elapsed between the initial blows to Mr. Hyams's head and the strangulation and stabbing.

Nevertheless some of the prosecution's own witnesses revealed flaws in the state's theory. A hair and fiber expert testified that facial hair discovered underneath Mr. Hyams's fingernails could not have come from Mr. Demarest. A blood expert testified that there was no evidence that blood had been transferred between Mr. Hyams and Mr. Demarest.

The district attorney also introduced testimony about the scratches on Mr. Demarest's hands and face. A workman and a neighbor who observed Mr. Demarest as he waited by the gravel driveway for emergency personnel to arrive after calling the sheriff's department both testified that they did not observe Mr. Demarest hitting his hands on the gravel. Mark Davidson, a volunteer fireman who spoke to Mr. Demarest while he waited outside the house, similarly stated that he did not notice Mr. Demarest hitting his hands on the gravel and would have remembered seeing it. Carol Held, the housemate of Mr. Demarest and Mr. Hyams, testified that when she met Mr. Demarest at the local medical center on the afternoon of February 9, she noticed that his right hand was swollen and there was a small amount of blood on his cuticles. She added that Mr.

Demarest told her that he had scratched his hands by hitting rocks. Finally, Eileen Bausch, a receptionist at Mr. Hyams's dentist's office, testified that she did not see Mr. Demarest's hands when he entered the office. The district attorney invoked Ms. Bausch's testimony in arguing that Mr. Demarest's hands were already scratched--from the struggle with Mr. Hyams--when he entered the dentist's office and that he concealed his hands from Ms. Bausch so that he could concoct the story about pounding his fists on the gravel when he later returned home.

The prosecution also offered testimony regarding a damp washcloth found in a shower near Mr. Hyams's bedroom and testimony indicating that Mr. Demarest had changed shirts on the morning of the murder. According to Detective Hopkins, the washcloth appeared to contain traces of blood. The prosecution argued that an intruder would not have showered after killing Mr. Hyams and that, as a result, the damp washcloth constituted additional evidence that Mr. Demarest was the murderer. As to Mr. Demarest changing shirts on the morning of the murder, the prosecution argued that the explanation offered by Mr. Demarest during questioning by sheriff's deputies--that he had changed from a flannel shirt to a white shirt because he had a business meeting and thought that the white shirt looked better--was not credible. According to the prosecution, the real reason that Mr. Demarest changed shirts was that, after the fatal struggle with Mr. Hyams, Mr. Demarest's shirt was covered with blood.

8

Finally, the prosecution pointed to several inconsistencies in Mr. Demarest's statements to the sheriff's deputies. It noted that Mr. Demarest had given conflicting answers concerning where he drove after leaving the dentist's office and whether he knew the identity of Mr. Hyams's realtor. The district attorney suggested that these inconsistencies indicated that Mr. Demarest had fabricated the entire account of his activities on the morning of February 9, 1981, in order to conceal the fact that he had murdered Mr. Hyams.

As to a possible motive for the murder, the prosecution offered several explanations. At one point, it suggested that Mr. Demarest may have stolen some of Mr. Hyams's jewelry and then hidden it in the house where jewelry was later discovered. The prosecution also suggested that Mr. Demarest may have been jealous of Mr. Hyams's business success or upset because Mr. Hyams was planning to move to Boulder. However, the prosecution offered no evidence that Mr. Demarest was angry with Mr. Hyams.

On behalf of Mr. Demarest, Mr. Cohan formulated a defense based on the contention that Mr. Hyams had been murdered by Margery Sheppard, a woman whom Mr. Hyams had rejected as a business partner. Mr. Cohan's strategy was to call Ms. Sheppard as a witness at trial, question her about the murder, and then argue to the jury that she was the murderer. Apparently, despite discovering no evidence to support this theory, Mr. Cohan remained committed to it and did very little to prepare for trial. He

9

interviewed neither the prosecution's expert witnesses nor Volunteer Fireman Davidson and Ms. Bausch, two important witnesses with regard to the scratches on Mr. Demarest's hands. Additionally, Mr. Cohan did not listen to the tapes of the deputies' interrogations of Mr. Demarest and never sought to obtain the records of Mr. Demarest's psychiatric treatment immediately after the murder.

At trial, Mr. Cohan was unable to pursue the theory that Ms. Sheppard was the murderer. After learning of Mr. Cohan's plan to call her as a witness, Ms. Sheppard notified the judge that she would invoke her Fifth Amendment right not to testify. The judge then applied the Colorado law of privilege and ruled that Mr. Cohan would not be allowed to call Ms. Sheppard.

Accordingly, Mr. Cohan called no witnesses in Mr. Demarest's defense. During closing argument, he speculated that Mr. Hyams had been murdered by a person involved with drugs or by a spurned woman, but he was unable to point to any evidence supporting these contentions. Evidence introduced in post-conviction proceedings revealed that Mr. Cohan had never tried a felony case in state court and that his only criminal trial experience consisted of four or five federal misdemeanor cases involving the tax laws. Additionally, as his only investigator Mr. Cohan had hired a radio disc jockey with no relevant experience in criminal matters.

On October 27, 1981, the jury convicted Mr. Demarest of the first-degree murder of Mr. Hyams. In December 1981, the court sentenced Mr. Demarest to life

10

imprisonment. Mr. Demarest appealed, and the Colorado Court of Appeals affirmed his conviction and sentence in May 1984. See Demarest, 905 F. Supp. at 1441 (citing State v. Demarest, No. 82 CA 122 (Colo. Ct. App. 1984)). The Supreme Court of Colorado denied certiorari. See id. (citing State v. Demarest, No. 84 SC 295 (Colo. 1984)).

In June 1985, Mr. Demarest filed a motion in the Jefferson County District Court for post-conviction relief pursuant to Rule 35(c) of the Colorado Rules of Criminal Procedure in which he argued that he had received ineffective assistance of counsel at trial. He was represented in the Rule 35(c) proceeding by a Deputy State Public Defender. The court conducted an evidentiary hearing on the motion, and Mr. Demarest's counsel called three witnesses: Mr. Cohan, Charles Hoppin (an attorney), and Mr. Demarest. Mr. Cohan acknowledged that he committed a number of significant errors in representing Mr. Demarest at trial, including: failing to hire experienced co-counsel, failing to effectively argue for the suppression of Mr. Demarest's statements to law enforcement officers on the grounds that they were not voluntarily made, failing to interview the state's witnesses before trial, failing to effectively cross-examine the state's blood-spatter expert, failing to consult his own blood-spatter expert, and failing to raise certain issues in a motion for a new trial. Mr. Hoppin testified that Mr. Cohan's representation of Mr. Demarest fell below what should be expected of a reasonably competent defense attorney. He cited Mr. Cohan's lack of experience in criminal trials, his failure to retain co-counsel, his failure to effectively argue for suppression of Mr.

11

Demarest's statements to law enforcement agents, his failure to challenge the state's blood-spatter expert, and his failure to hire an expert of his own. Mr. Hoppin opined that there was a reasonable probability that Mr. Cohan's deficient performance affected the outcome of the trial. In his testimony at the Rule 35(c) hearing in the state court, Mr. Demarest described his dissatisfaction with Mr. Cohan's representation and discussed his mental state during the interrogations by the deputy sheriffs. See Rec. vol. V, State v. Demarest, No 81-CR 259, vol. 3 (Tr. of Evidentiary Hr'g of Dec. 2, 1985).

After considering this evidence, the district court issued a written ruling denying Mr. Demarest's Rule 35(c) motion. Mr. Demarest appealed, the Colorado Court of Appeals affirmed the district court's decision, see id. vol. 2, at 302-303 (Unpublished Op. filed Apr. 7, 1988), and the Colorado Supreme Court denied certiorari, see id. at 301 (Order filed Dec. 19, 1988).

In February 1989, Mr. Demarest filed a second Rule 35(c) motion in the Jefferson County District Court. The district court denied Mr. Demarest's second motion, see id. at 354-56 (Order filed Mar. 8, 1989); the Colorado Court of Appeals affirmed, see State v. Demarest, 801 P.2d 6 (Colo. Ct. App. 1990); and the Colorado Supreme Court denied certiorari, see Demarest, 905 F. Supp. at 1442 (citing Colorado v. Demarest, No. 90 SC 439 (Order filed Nov. 19, 1990)).[1]

---

[1] In this second motion, Mr. Demarest contended that: (1) he did not receive a constitutionally adequate competency hearing prior to trial; (2) exculpatory evidence was improperly excluded at trial; (3) on direct appeal of his conviction, the Colorado

In May 1991, Mr. Demarest filed in the United States District Court for the District Court of Colorado the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The federal petition combined the allegations of his first state post-conviction motion with many of the allegations of his second motion. In particular, Mr. Demarest alleged that: (1) he received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments; (2) the Colorado Court of Appeals relied on matters not in the record in deciding his direct criminal appeal, thereby violating his Fifth and Fourteenth Amendment rights; (3) the Jefferson County District Court failed to hold an adequate hearing regarding his competency to stand trial, thus violating the Fifth and Fourteenth Amendments; (4) the Colorado Court of Appeals violated his Fifth and Fourteenth Amendment rights by reviewing the denial of the post-conviction motions without the complete record and without briefing or argument; (5) the Jefferson County District Court violated his Fifth and Fourteenth Amendment rights by refusing to consider the voluntariness of his statements to deputy sheriffs; and (6) the Colorado Court of Appeals violated his Fifth, Sixth, and Fourteenth Amendment rights by failing to remand his case for a new trial in light of a new decision.

---

Court of Appeals improperly failed to apply recent law in violation of his constitutional rights by deciding the case without the full record; (4) cases decided during his direct appeal entitled him to a new trial; and (5) the prosecutor introduced unduly prejudicial evidence.

13

The federal district court assigned the case to a magistrate judge. Upon review of the record of the state court proceedings, the magistrate judge issued a recommendation concluding that the petition should be granted because Mr. Demarest had received ineffective assistance of counsel at the state murder trial in violation of the Sixth Amendment. A federal district court judge then reviewed this recommendation and remanded the case to the magistrate judge for further proceedings regarding the issue of whether Mr. Cohan's acts and omissions prejudiced Mr. Demarest, "i.e., whether, but for [Mr.] Cohan's errors, there was a reasonable possibility that the outcome of Demarest's case would have been different." Demarest, 905 F. Supp. at 1443.

In October 1994, the magistrate judge held an evidentiary hearing. In support of his ineffective assistance of counsel claim, Mr. Demarest called several witnesses who had not testified in the state court post-conviction proceedings. Dr. Richard Cohen, a colo-rectal surgeon, testified that he had performed hemorrhoid surgery on Mr. Demarest shortly before trial and had prescribed narcotics and tranquilizers for him. A cellmate of Mr. Demarest's testified that he was in severe pain and took a great deal of medication during the period of the trial. Dr. Kathy Vedeal, a toxicologist, testified that the prescription drugs that Mr. Demarest was taking at the time of trial could have caused impaired mental ability, mental confusion, and decreased alertness.

Mr. Demarest also introduced evidence at the hearing before the magistrate judge challenging the blood-spatter evidence offered by the prosecution at trial. Dr. Donald

14

Kennedy, a fluid dynamics expert, testified that there was no scientific basis for the inferences that Detective Hopkins drew from the pattern of blood stains at the murder scene.

Mr. Demarest then introduced testimony from Eileen Bausch and Mark Davidson regarding the scratches on Mr. Demarest's hands. Ms. Bausch testified that she must have seen Mr. Demarest's hands at the dentist's office. She added that during her testimony at Mr. Demarest's trial in Jefferson County in 1981, she was nervous and her memory was cloudy. Ms. Bausch said because she misunderstood the prosecutor's question at trial, she had incorrectly stated that she had not seen Mr. Demarest's hands. She added that if Mr. Cohan had interviewed her prior to trial, she would have stated clearly in her trial testimony that there were no scratches on Mr. Demarest's hands and face when he came into the dentist's office.

Similarly, Mark Davidson, the volunteer fireman who had spoken to Mr. Demarest in Mr. Demarest's front yard on the day of the murder, testified at the evidentiary hearing that he had observed Mr. Demarest pounding his hands into the gravel. Like Ms. Bausch, Mr. Davidson said that if Mr. Cohan had interviewed him prior to trial, he would have testified at trial that Mr. Demarest had pounded his fists into the gravel.

Mr. Demarest also presented testimony from Dr. William Rehg, one of the psychiatrists who treated him after the murder. Dr. Rehg stated that, in the days after the murder, Mr. Demarest suffered from adult situational reaction syndrome in response to

15

severe, acute stress and was treated with several medications. Finally, Mr. Demarest called Lee Foreman, a legal expert who testified that Mr. Cohan's representation was constitutionally deficient and that, if Mr. Cohan's mistakes had not occurred, the result of Mr. Cohan's trial probably would have been different. Mr. Foreman focused on Mr. Cohan's failure to argue for the suppression of Mr. Demarest's statements to the police, his failure to present medical and psychiatric evidence to the jury to explain Mr. Demarest's emotional reactions, his failure to challenge the state's blood-spatter evidence, and his failure to interview witnesses before trial.

After the evidentiary hearing, the magistrate judge issued a second recommendation concluding that Mr. Demarest had been deprived of his right to effective assistance of counsel and that his petition for a writ of habeas corpus should be granted. The federal district court agreed with the magistrate judge's recommendation. The court first concluded that in pursing the theory that Ms. Sheppard was the real murderer, seeking to establish this fact by questioning her at trial, failing to interview the state's witnesses, and failing to conduct any investigation of his own, Mr. Cohan's representation of Mr. Demarest at trial "'fell below an objective standard of reasonableness.'" Demarest, 905 F. Supp at 1446-50 (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)). The district court then concluded that "[Mr.] Cohan's failure to investigate the State's case against [Mr.] Demarest, consider alternative defense theories, interview the Prosecution's witnesses, and present the jury with medical

16

evidence relating to [Mr.] Demarest's psychological state in the days following [Mr.] Hyams' murder materially prejudiced [Mr.] Demarest." Id. at 1453. "Absent [Mr.] Cohan's failings," the court continued, "there is a reasonable probability that the outcome of [Mr.] Demarest's trial would have been different." Id. at 1454. Accordingly, the court granted Mr. Demarest's petition for a writ of habeas corpus. See id. at 1456.

## II. DISCUSSION

### A. Application of the Antiterrorism and Effective Death Penalty Act

As a preliminary matter, we must decide what version of the habeas corpus statutes to apply. Sections 101-06 of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (1996), signed into law on April 24, 1996, amend §§ 2244 and 2253-55 of chapter 153 of Title 28 of the United States Code (federal statutes concerning habeas corpus proceedings). The state argues that this court should apply the AEDPA to Mr. Demarest's habeas petition. Mr. Demarest responds that because his habeas petition was filed in the district court in 1991, well before the AEDPA was enacted, application of its provisions to this case would afford the statutory amendments an improper retroactive effect.

The circuits have reached contrasting conclusions regarding the applicability of the AEDPA to cases filed before its effective date. In Edens v. Hannigan, 87 F.3d 1109, 1112 n.1 (10th Cir. 1996), this circuit concluded that the AEDPA did not apply to a non-

17

capital case in which the initial habeas petition was filed before April 24, 1996. See also

Boria v. Keane, 90 F.3d 36, 38 (2d Cir. 1997) (per curiam) (concluding that the AEDPA

does not apply to habeas petitions filed before April 24, 1996). In Lindh v. Murphy, 96

F.3d 856 (7th Cir. 1996), rev'd, 117 S. Ct. 2059 (1997), the Seventh Circuit disagreed,

holding that the AEDPA should be applied to all pending cases.

The Supreme Court granted certiorari in Lindh and resolved this conflict. See 117

S. Ct. at 2062. The Court noted that, in contrast to the provisions concerning non-capital

cases, Congress included a section in the AEDPA regarding capital cases that stated that

it applied "'to cases pending on or after the date of enactment of this Act." Id. at 2063

(quoting AEDPA § 107(c)). Reading the AEDPA as a whole, the Court concluded that

the Act "reveals Congress's intent to apply the amendments to chapter 153 [regarding the

habeas corpus statutes for non-capital cases] only to such cases as were filed after the

statute's enactment." Id at 2063.[2] As a result, the Court held that "the new provisions of

chapter 153 generally apply only to cases filed after the [AEDPA] became effective." Id.

at 2068.

Mr. Demarest's habeas petition was filed in the district court in 1991, well before

the AEDPA's April 24, 1996, effective date. Accordingly, we conclude that the AEDPA

does not apply to these proceedings.

---

[2]     The Court did note that Congress did provide that a few specific sections of
the AEDPA were applicable to pending non-capital cases. See Lindh, 117 S. Ct. at 2063.
None of those specific provisions was at issue in Lindh or in the instant case.

B. Exhaustion of State Remedies

Under the doctrine of exhaustion, a state prisoner must generally exhaust available state court remedies before filing a habeas corpus action in federal court. See Picard v. Connor, 404 U.S. 270, 275 (1971); Hernandez v. Starbuck, 69 F.3d 1089, 1092-93 (10th Cir. 1995), cert. denied, 116 S. Ct. 1855 (1996). At the time Mr. Demarest filed his habeas petition in the federal district court, the doctrine was codified at 28 U.S.C. § 2254(b), which provided:

:    An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of a State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

The doctrine reflects the policies of comity and federalism between the state and federal governments, a recognition that "'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation.'" Picard, 404 U.S. at 275 (quoting Darr v. Burford, 339 U.S. 200, 204 (1950), overruled on other grounds by Fay v. Noia, 372 U.S. 391(1963)).

The exhaustion doctrine requires a state prisoner to "fairly present[]" his or her claims to the state courts before a federal court will examine them. Picard, 404 U.S. at 275; see also Nichols v. Sullivan, 867 F.2d 1250, 1252 (10th Cir. 1989) (discussing fair

19

presentation requirement).  "Fair presentation" of a prisoner's claim to the state courts means that the substance of the claim must be raised there.  The prisoner's allegations and supporting evidence must offer the state courts "a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."  Anderson v. Harless, 459 U.S. 4, 6 (1982) (citing Picard, 404 U.S. at 276-77).  Therefore, although a habeas petitioner will be allowed to present "'bits of evidence'" to a federal court that were not presented to the state court that first considered his claim, evidence that places the claims in a significantly different legal posture must first be presented to the state courts.  Jones v. Hess, 681 F.2d 688, 694 (10th Cir. 1982) (quoting Nelson v. Moore, 470 F.2d 1192, 1197 (1st Cir. 1972)).

In the instant case,  the state argues that Mr. Demarest failed to exhaust his state remedies by failing to fairly present his ineffective assistance of counsel claim to the Colorado state courts. The state focuses on several witnesses at the federal evidentiary hearing: (1)  Eileen Bausch and Mark Davidson who stated that, if they had been interviewed by Mr. Demarest's attorney before his state court trial, they would have given testimony at the trial that directly supported Mr. Demarest's assertion that he scratched his hands by pounding them onto the driveway after finding Mr. Hyams's body; (2) Dr. Donald Kennedy, who challenged the scientific basis of the evidence offered at trial by the state's blood-spatter expert; (3)  Lee Foreman, the legal expert who testified at the federal evidentiary hearing that Mr. Cohan should have interviewed witnesses,  presented

20

a blood-spatter expert like Dr. Kennedy to challenge the state's evidence, and presented medical and psychiatric testimony to the jury to explain Mr. Demarest's emotional breakdowns in the days after Mr. Hyams's murder; and (4) Dr. Kathy Vedeal, a toxicologist, and Dr. William Rehg, a psychiatrist, who testified as to Mr. Demarest's mental state during the period after Mr. Hyams's murder. The state argues that these witnesses offered evidence at the federal evidentiary hearing that significantly altered Mr. Demarest's ineffective assistance of counsel claim, placing it in a much stronger legal posture than in the state court proceedings. Because the Colorado state courts did not have an opportunity to consider this evidence, the state maintains, Mr. Demarest has failed to exhaust his state remedies by failing to present his ineffective assistance of counsel claims to the state courts.

Mr. Demarest responds that, with regard to the testimony of Mr. Foreman and Drs. Kennedy, Vedeal, and Rehg, the state has waived the defense of failure-to-exhaust. He notes that the state failed to object to their testimony at the evidentiary hearing before the magistrate judge and did not challenge their testimony in its written objections to the magistrate judge's findings and recommendations. As to Ms. Bausch and Mr. Davidson (whose testimony the state did challenge in the district court proceedings for failure-to-exhaust), Mr. Demarest contends that this evidence did not fundamentally alter his claim that his trial counsel was ineffective in failing to interview witnesses before trial. As a

21

result, he contends, the new testimony offered by these two witnesses at the federal

evidentiary hearing does not contravene the exhaustion requirement.[3]

## 1. The State's Alleged Waiver

The exhaustion requirement, although not to be lightly overlooked, is not

jurisdictional.  See Granberry v. Greer, 481 U.S. 129, 131 (1987); Hernandez, 69 F.3d at

1092-93.  As a result, there are circumstances in which a state may be deemed to have

waived the exhaustion defense such that a federal court may consider the merits of a

petitioner's claims--even though those claims have not been fairly presented to the state

---

[3]      On appeal, Mr. Demarest also briefly argues that this court need not analyze the evidence presented at the federal evidentiary hearing because the evidence presented to the Jefferson County District Court in support of his motion for post-conviction relief under Colorado Rule of Criminal Procedure 35(c) is sufficient to establish that he received ineffective assistance of counsel pursuant to Strickland v. Washington, 466 U.S. 668, 687 (1984).  See Aple's Br. at 21-22.  We are not persuaded by this argument.

Although the evidence presented at the state court hearing provides ample support for the first element of the Strickland analysis, that trial counsel's errors "fell below an objective standard of reasonableness," Strickland, 466 U.S. at 688,  there is little concrete evidence in the state court record to establish the second Strickland element, that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.  In particular, the evidence presented by Mr. Demarest  at the state court hearing does not establish what effect the interviewing of witnesses before trial and the presentation of expert witnesses by defense counsel at trial would have had on result of the murder case.  Without evidence in the state court record as to how witnesses would have testified differently if they had been interviewed or as to what defense experts would have said to challenge the state's scientific evidence, the prejudicial effect of trial counsel's errors is highly speculative.

In light of the insufficiency of the state court record,  we must therefore proceed to analyze the evidence presented by Mr. Demarest at the federal evidentiary hearing and then to determine whether he has exhausted his state court remedies.

22

courts.  See Granberry, 481 U.S. at 131.[4]  In Granberry, the Supreme Court noted that when the state answers a habeas petition, it is obligated to advise the district court whether the petitioner has exhausted all available remedies.  See id. at 134.  However, in instances in which the state has failed to raise a failure-to-exhaust defense in the district court proceedings, the courts of appeals may "take a fresh look at the issue," determining "whether the interests of comity and federalism will be better served by addressing the merits forthwith or by requiring a series of additional state and district court proceedings before reviewing the merits of the petitioner's claim."  Id.

In the instant case, the state has candidly conceded that its failure to object to the testimony of Mr. Foreman and Drs. Kennedy, Vedeal, and Rehg was "an unfortunate oversight."  See Aplt's Opening Br. at 31.  Moreover, we emphasize that, in order to afford the district court a reasonable opportunity to fairly adjudicate the relevant issues in the case, the defense of failure-to-exhaust should be raised as soon as reasonably possible, a practice that the state did not follow here when it specifically objected to only the Bausch and Davidson testimony at the federal hearing.

---

[4]    We note that the AEDPA amendments to 28 U.S.C. § 2254 change the Granberry rule with regard to cases filed after April 24, 1996.  Under the amended version of § 2254(b)(3), "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement."  28 U.S.C. § 2254 (b)(3) (1996).  In the instant case, because Mr. Demarest filed his habeas petition in federal court in 1991, we apply Granberry rather than the amended version of § 2254(b)(3).

Nevertheless, considering the comity and federalism interests at issue in this case, we conclude for several reasons that the state's failure to specifically object to the testimony of Mr. Foreman and Drs. Vedeal, Rehg, and Kennedy should not be deemed a waiver of the failure-to-exhaust defense as to these witnesses. First, unlike several of the decisions that have found a waiver of the defense, the state here did not completely fail to raise the issue before the district court ruled on the petition. See Hannon v. Maschner, 981 F.2d 1142, 1146-47 (10th Cir. 1992) (declining to consider a failure-to-exhaust defense when the issue was not raised until oral argument on the motion to reconsider the order granting the writ); Stone v. Godbehere, 894 F.2d 1131, 1135 (9th Cir. 1990) (declining to consider the defense when the state failed to raise it at any point in the district court proceedings). Not only did the state object to the testimony of Ms. Bausch and Mr. Davidson (on the grounds that this testimony had not been presented to the state courts), but it also objected to the federal evidentiary hearing. See Rec. vol. I, doc. 46. In its objection, the state contended that because Mr. Demarest had been afforded an opportunity to develop his claims in the state court proceedings, an evidentiary hearing in the federal district court was improper. Although the state's objection did not refer to the testimony of particular witnesses--a practice which would have been highly preferable if it sought to invoke the failure-to-exhaust defense--its contention that the state court record was sufficient to adjudicate Mr. Demarest's claim and that new evidence should not be taken did raise the comity and federalism concerns on which the exhaustion

24

requirement is based. Accordingly, applying Granberry, we conclude that the state may now raise the failure-to-exhaust defense as to the referenced testimony of Mr. Foreman and Drs. Kennedy, Vedeal, and Rehg (as well as Ms. Bausch and Ms. Davidson). Cf. Caballero v. Keane, 42 F.3d 738, 741 (2d Cir. 1994) (rejecting argument that a habeas petitioner waived a failure-to-exhaust argument by failing to raise it in the federal district court proceedings because "[a]n important unresolved issue has not yet been considered by the state courts, and a procedure especially suited to air this issue is still available.").

## 2. Fair Presentation of Mr. Demarest's Claims to the State Courts

Because the state did not specifically raise the defense of failure to exhaust with regard to the testimony of Mr. Foreman and Drs. Vedeal, Rehg, and Kennedy, the district court did not consider the impact of that testimony on the issue of whether Mr. Demarest's ineffective assistance of counsel claim had been fairly presented to the state courts. However, with regard to Ms. Bausch and Mr. Davidson, the district court agreed with Mr. Demarest that their testimony was "supplementary evidence of [Mr.] Cohan's failure to investigate." Demarest, 905 F. Supp. at 1446. According to the district court, "The testimony [Ms.] Bausch and [Mr.] Davidson gave at the evidentiary hearing does not alter the nature of [Mr.] Demarest's claim, nor does it significantly bolster the claim so as to substantially influence the ultimate determination of [Mr.] Demarest's petition for writ of habeas corpus." Id. The district court found the Bausch and Davidson testimony

25

analogous to the new evidence presented to the federal district court in Vasquez v.

Hillary, 474 U.S. 254 (1986), which the Supreme Court characterized as not altering the

nature of the habeas claim that had been presented to the state courts, see id. at 260. See

Demarest, 905 F. Supp. at 1446.

In analyzing the parties' arguments and the district court's conclusions, we are

guided by this circuit's decision in Jones v. Hess, 681 F.2d 688 (10th Cir. 1982), and by

Fourth and Fifth Circuit decisions adopting similar reasoning, see Wise v. Warden,

Maryland Penitentiary, 839 F.2d 1030 (4th Cir. 1988); Dispensa v. Lynaugh, 826 F.2d

375 (5th Cir. 1987). In Jones, the habeas petitioner asserted a claim that the trial judge

was biased. In the federal court proceedings, the petitioner introduced three ex parte

letters from the allegedly biased judge to the prosecutor concerning the petitioner's case.

The letters had not been introduced in the state court proceedings. This circuit concluded

that the judge's ex parte letters "transformed the claim of bias and prejudice into a

significantly different and more substantial claim," placing the claim "in a significantly

different and stronger posture than it was when the state courts considered it." Jones, 681

F.2d at 693-94. The court therefore held that the petitioner's bias claim was properly

dismissed for failure to exhaust state court remedies. See id. at 694.

The Fourth and Fifth Circuits have adopted an approach similar to Jones in

concluding that new evidence presented at a federal evidentiary hearing warranted

dismissal of a habeas claim for failure to exhaust. In Wise, the habeas petitioner alleged

26

that the state had withheld exculpatory evidence that a witness who testified against him at trial had entered into an agreement with state. See Wise, 839 F.2d at 1034. At the federal evidentiary hearing, the petitioner introduced for the first time the actual agreement between the state and the witness. The Fourth Circuit held that the agreement constituted new evidence that significantly altered the nature of the petitioner's claims. As a result, the court concluded, the petition should be dismissed for failure to exhaust. "The state court, which has never been presented with this critical evidence, must be given the opportunity to evaluate the claim in its new posture and to make the relevant findings of fact to which the federal courts must in turn defer." Id.

Similarly, in Dispensa, the habeas petitioner challenged the reliability of the victim's in-court identification of him as well as the procedures used by police to elicit the victims's pretrial, out-of-court identification. See Dispensa, 826 F.2d at 376, 379. At the federal evidentiary hearing, the petitioner offered expert testimony from a psychologist regarding the victim's choice of words and emotional state during the in-court identification. Additionally, in the federal hearing, the habeas petitioner described the out-of-court identification procedures in a manner that differed significantly from the description he had given in the state court proceedings. The Fifth Circuit held that the habeas petition should be dismissed for failure to exhaust because the petitioner's changed testimony as well as the new expert testimony placed his claim in a significantly stronger posture than when he presented the claim to the state courts. See id. at 379-80.

See also Joyner v. King, 786 F.2d 1317, 1320 (5th Cir. 1986) (noting that a petitioner who presents a weak case to the state court and a strong case to the federal court fails to satisfy the exhaustion requirement); Sampson v. Love, 782 F.2d 53, 54-55, 58 (6th Cir. 1984) (dismissing habeas petition for failure to exhaust when new evidence presented in the federal hearing showed that jurors knew about petitioner's previous sentence); Brown v. Estelle, 701 F.2d 494, 495 (5th Cir. 1983) ("Where a federal habeas petitioner presents newly discovered evidence or other evidence not before the state courts such as to place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, the state courts must be given an opportunity to consider the evidence."); cf. Williams v. Washington, 59 F.3d 673, 677-79 (7th Cir. 1995) (concluding that the introduction of new evidence in federal court did not contravene exhaustion requirement because new evidence merely contained information that was available from other sources contained in the state court record).

In the instant case, we apply the analysis followed by Jones and similar decisions to the new evidence offered by Mr. Demarest in the federal evidentiary hearing. As explained below, consideration of the testimony of the new witnesses leads us to conclude that Mr. Demarest's ineffective assistance of counsel claim was not fairly presented to the state courts.

### a. Testimony of Eileen Bausch and Mark Davidson

In the state court hearing on his ineffective assistance of counsel claim, Mr. Demarest offered testimony from his trial counsel acknowledging that he had failed to adequately investigate the case and failed to interview certain witnesses. Although trial counsel listed particular witnesses that he failed to interview, he did not mention Ms. Bausch or Mr. Davidson.[5] Moreover, at no point in the state post-conviction proceedings did Mr. Demarest even mention the testimony of Ms. Bausch or Mr. Davidson or contend, as he did so vigorously in the federal proceedings, that if Mr. Cohan had interviewed them prior to trial, they would have testified in a manner that would have substantially strengthened Mr. Demarest's defense regarding the cause of the scratches on his hand.

We disagree with the district court's conclusion that "[Ms.] Bausch and [Mr.] Davidson's testimony [at the federal evidentiary hearing] does not significantly change the nature of [Mr.] Demarest's allegations." Demarest, 905 F. Supp at 1446. Ms. Bausch and Mr. Davidson's testimony constituted significant evidence that Mr. Cohan's failure to interview them prejudiced Mr. Demarest's defense. As the district court itself observed, Ms. Bausch testified at the federal hearing that had Mr. Cohan interviewed her before

---

[5] Mr. Cohan listed the following witnesses that he failed to interview: Detective Hopkins (the state's blood-spatter expert), the state's pathologist, the medical personnel who treated Mr. Demarest at St. Anthony's hospital, the personnel who drove Mr. Demarest to the hospital on the day of the murder and after he collapsed during the interrogation on February 12, 1981, and the neighbor who waited with Mr. Demarest for emergency personnel to arrive. See Rec. vol. V, State v. Demarest, No. CR. 81-259, vol 3, at 17-19, 27 (Tr. of Evidentiary Hr'g of Dec. 2, 1985).

trial, he could have elicited from her testimony that she observed Mr. Demarest's hands at the dental office on the morning of the murder but did not remember seeing scratches on his hands. In the words of Mr. Demarest's legal expert in the federal proceedings, "the significance of [Ms. Bausch's testimony] . . . can't be over dramatized." Rec. vol. III, at 216 (Tr. of Evidentiary Hr'g of Oct. 17, 1994). Similarly, Mr. Davidson stated that if Mr. Cohan had interviewed him before trial, he would have testified that he remembered observing Mr. Demarest pounding his hands on the gravel driveway after discovering Mr. Hyams's body. The testimony of both these witnesses supports the contention that more thorough pretrial preparation by Mr. Cohan would have uncovered evidence that very significantly strengthened Mr. Demarest's defense. However, because this testimony was not presented in the state post-conviction proceedings, the state courts were deprived of the opportunity to assess the prejudicial effect of Mr. Cohan's failure to interview Ms. Bausch and Mr. Davidson.

We also disagree with the district court's conclusion that "the introduction of the additional testimony is similar to the circumstances presented in Vasquez." Demarest, 905 F. Supp. at 1446. In Vasquez, in response to a request from a federal district court for evidence clarifying and supplementing the state court record, the petitioner submitted additional affidavits and a computer analysis to support the allegation that the state had improperly excluded African-Americans from a grand jury. See Vasquez, 474 U.S. at 258-59. The Supreme Court held that the new evidence did not circumvent the

exhaustion requirement. As to the new affidavits, the Court noted that they were introduced to support allegations that were already supported by evidence in the state court record. As to the computer analysis, the Court said that it added nothing that was not intrinsic to any grand jury discrimination claim. See id. at 260.

Unlike the new evidence in Vasquez, the new evidence obtained from Ms. Bausch and Mr. Davidson does not merely supplement evidence in the state court record; it is more like a 180 degree turn. No evidence in the state court record indicates that a pretrial interview of these two witnesses by Mr. Demarest's counsel would have produced credible testimony so highly favorable to his defense. Vasquez fails to support the district court's conclusion that Ms. Bausch and Mr. Davidson's new testimony did not significantly change the nature of Mr. Demarest's allegations.

### b. Blood-spatter Evidence

We reach the same conclusion as to the new testimony offered by Mr. Demarest regarding the state's blood-spatter evidence. As noted above, in the state court proceedings, Mr. Demarest did allege that Mr. Cohan had failed to challenge the qualifications of Dr. Herbert MacDonell, the state's first designated blood-spatter expert. Mr. Demarest also alleged that Mr. Cohan had failed to effectively cross-examine Detective Dick Hopkins, the witness who actually testified at the trial regarding the blood-spatter evidence. Additionally, Charles Hoppin, the legal expert who testified at

the state evidentiary hearing opined that Mr. Demarest's trial attorney should have interviewed the state's expert witnesses and should have consulted with an independent blood-spatter expert in order to properly evaluate and respond to the state's evidence. See Rec. vol. V, State v. Demarest, No. CR 81-259, vol. 3 at 92-98 (Tr. of Evidentiary Hr'g of Dec. 2, 1985).

However it was not until the federal evidentiary hearing that Mr. Demarest offered evidence from Dr. Donald Kennedy challenging the scientific basis of the state's expert testimony. Dr. Kennedy began his testimony at the federal hearing by examining the manual on blood-spatter evidence written by Dr. MacDonell, the witness initially designated as the state's expert. Detective Hopkins, the state witness who actually testified at trial regarding the blood-spatter evidence, attended Dr. MacDonell's course and relied on his manual in reaching his conclusions. According to Dr. Kennedy's testimony, the manual indicated that Dr. MacDonell lacked a basic understanding of the fluid dynamics of blood droplets.

Dr. Kennedy proceeded to explain numerous specific errors in Dr. MacDonell's manual. He criticized the experiments that it described, characterizing them as "poor high school science." Rec. vol. II at 46 (Tr. of Evidentiary Hr'g of Oct. 17, 1994). He explained that Dr. MacDonell did not understand basic principles of fluid dynamics such as viscosity and surface tension. He described several measurements pertaining to the

32

fluid dynamics of blood droplets--the bond number, the Weber number, and the Reynolds number--and said that Dr. MacDonell lacked a basic understanding of these concepts.

Then, Dr. Kennedy offered explanations of the ways in which Detective Hopkins's trial testimony reflected Dr. MacDonell's limited scientific understanding. He disagreed with Detective Hopkins's statement that one could determine the type of weapon used by applying the principles of fluid dynamics to the blood droplets found at a crime scene. He also questioned Detective Hopkins's opinions as to the sequence of events leading up to the murder, as to the type of weapon used, and as to the physical characteristics of the murderer (i.e. that the murderer was a strong, right-handed man), stating that fluid dynamics did not allow one to draw definitive conclusions about these matters.

Essentially, Dr. Kennedy's testimony regarding the state's blood-spatter evidence was that the "physics are wrong, so the science is wrong, so the conclusions are wrong." See Rec. vol. II at 64 (Tr. of Evidentiary Hr'g of Oct. 17, 1994). No evidence of this kind was presented in the state court proceedings. Thus, it was not until after Dr. Kennedy's testimony in the federal court proceedings that Mr. Demarest could point to evidence that an adequate pretrial investigation by Mr. Cohan would have uncovered strong scientific evidence that could be used to challenge the state's witnesses.

Mr. Demarest's new expert testimony from Dr. Kennedy resembles the new expert testimony offered by the petitioner in the Fifth Circuit's decision in Dispensa, 826 F.2d at 379-80. As in that case, the new evidence offered by Mr. Demarest through Dr. Kennedy

33

and Mr. Foreman transformed his claim from one involving only general allegations of failing to investigate and cross-examine and only a minimal showing of prejudice into one involving a concrete reference to a qualified expert who could have been produced at trial to rebut the scientific basis of the state's case. We therefore conclude that Mr. Demarest's allegations regarding his trial counsel's failure to challenge the state's blood-spatter evidence were not fairly presented to the state courts.

### c. Medical and Psychiatric Evidence

We reach the same conclusion as to the medical and psychiatric evidence that Mr. Demarest produced at the federal evidentiary hearing to demonstrate how his mental state during the period shortly after Mr. Hyams's murder could have been explained to the jury. At the federal hearing, Mr. Demarest presented three witnesses on this subject who did not testify in the state court proceedings: (1) Dr. Kathy Vedeal, a toxicologist, who testified about the effects of medication taken by Mr. Demarest after the murder and stated that the medication could have blurred his thinking; (2) Dr. William Rehg, a psychiatrist, who testified about Mr. Demarest's mental state when Mr. Demarest was questioned by law enforcement officers and explained that Mr. Demarest's highly emotional state could have been caused by feelings of shock and grief over the death of a friend; and (3) Lee Foreman, Mr. Demarest's legal expert, who testified that Mr. Demarest's trial counsel should have introduced medical and psychological evidence such

34

as that given by Drs. Vedeal and Rehg to explain why Mr. Demarest had difficultly giving consistent and coherent answers when he was interrogated. According to Mr. Foreman, a competent defense attorney could have used this evidence to rebut the prosecution's contention that Mr. Demarest's confused answers and emotional reactions reflected consciousness of guilt and to establish that Mr. Demarest had acted as would someone who had recently learned that a friend had been murdered. See Rec. vol. III at 269-272 (Tr. of Evidentiary Hr'g of October 18, 1994).

Like the new testimony of Ms. Bausch and Mr. Davidson and the new blood-spatter evidence, Mr. Demarest did not present this contention and supporting evidence to the state courts in the post-conviction proceedings. In the state proceedings, Mr. Demarest alleged that his trial counsel had failed to discover medical records that could have been used to challenge the voluntariness of his statements to the police, thereby providing the basis for a motion to suppress. However, Mr. Demarest never alleged in the state court proceedings that medical and psychiatric evidence could be used to explain his emotional state to the jury in a manner that supported his innocence. Thus, the testimony given by Drs. Vedeal and Rehg and by Mr. Foreman at the evidentiary hearing significantly strengthened Mr. Demarest's contention that his trial counsel was ineffective in failing to present medical and psychiatric evidence to explain his emotional reactions to the jury. Thus, this aspect of Mr. Demarest's ineffective assistance of counsel claim was also not fairly presented to the state courts.

35

In summary, like the new evidence offered in the federal proceedings in <u>Jones</u>, <u>Wise</u>, <u>Dispensa</u>, and similar cases, the new evidence submitted to the district court by Mr. Demarest transformed his ineffective assistance of counsel claim into one that was "significantly different and more substantial."  <u>See</u> <u>Jones</u>, 681 F.2d at 693.   In the state court proceedings, Mr. Demarest made general allegations concerning his trial counsel's failure to investigate the case and interview witnesses.  However, in the federal proceedings, those general allegations were supported by testimony of several witnesses concerning the prejudicial effect of his trial counsel's deficient performance.  Therefore, upon considering the new testimony of Ms. Bausch, Mr. Davidson and Mr. Foreman, and Drs. Kennedy, Vedeal, and Rehg, we conclude that Mr. Demarest has failed to exhaust his state court remedies regarding his ineffective assistance of counsel claim

## C.  Procedural Bar

Generally, when a habeas petitioner has failed to exhaust his state court remedies, a federal court should dismiss the petition without prejudice so that those remedies may be pursued.  <u>See</u> <u>Jones</u>, 681 F.2d at 694 (affirming dismissal of habeas claim without prejudice for failure to exhaust); <u>see also</u> <u>Dispensa</u>, 826 F.2d at 381 (reversing the district court's grant of a writ and remanding the case with instructions to dismiss without prejudice).  However, in considering unexhausted claims, federal courts should consider whether, upon dismissal of the claims, the petitioner would then be able to raise them in

the state courts. "[I]f the court to which Petitioner must present his claims in order to meet the exhaustion requirement would now find those claims procedurally barred, there is a procedural default for the purposes of federal habeas review." Dulin v. Cook, 957 F.2d 758, 759 (10th Cir. 1992) (citing Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991)).

Here, Mr. Demarest filed his ineffective assistance of counsel claim in the state courts pursuant to Rule 35 of the Colorado Rules of Criminal Procedure. Rule 35 authorizes the state court to vacate a conviction that was imposed in violation of the laws or constitutions of the United States or Colorado. See Col. R. Crim. P. 35(c)(2)(I). Rule 35(c)(3) provides in part that "[t]he court need not entertain a second motion or successive motions for similar relief based upon the same or similar allegations on behalf of the same prisoner." Col. R. Crim. P. 35(c)(3). Accordingly, in order to determine whether Mr. Demarest would now be procedurally barred from bringing an ineffective assistance of counsel claim in state court based on the new evidence presented at the federal hearing, we must consider how the Colorado courts have interpreted Rule 35(c)(3)'s prohibition of second and successive motions.

The Colorado Supreme Court has held that "'[w]here a post-conviction application is filed, it should contain all factual and legal contentions of which the applicant knew at that time of filing, and failure to do so will, unless special circumstances exist, ordinarily result in  a second application containing such grounds being summarily denied.'"

37

Turman v. Buckallew, 784 P.2d 774, 780 (Colo. 1989) (en banc) (emphasis added) (quoting People v. Scheer, 518 P.2d 833, 835 (Colo. 1974)) (emphasis added); see also People v. Hubbard, 519 P.2d 945, 948 (Colo. 1974) (en banc) ("If a second or successive motion is filed, it may be summarily dismissed without a hearing unless the trial judge finds that the failure to include newly asserted grounds for relief in the first Crim. P. 35(b) motion is excusable."). Several Colorado decisions describe the kind of "special circumstances" that warrant the consideration of successive Rule 35 motions.

The lack of counsel in post-conviction proceedings is one such special circumstance. The Colorado Supreme Court has held that "in the absence of a knowing and intelligent waiver, the assistance of counsel is essential in post-conviction proceedings, unless the asserted claim for relief is wholly unfounded." Hubbard, 519 P.2d at 948 (citing Haines v. People, 454 P.2d 595 (Colo. 1969) and Kostol v. People, 447 P.2d 536 (Colo. 1968)). Given the convicted defendant's right to post-conviction counsel, the Colorado Supreme Court reasoned, it is possible for a full review of the defendant's claims to be accomplished in a single post-conviction proceeding and "no justification exists for condoning successive and often repetitive motions for post-conviction relief." Id. In contrast, when a defendant represents himself pro se, he or she cannot reasonably be expected to raise all of his or her claims in a single proceeding. See id. ("The case law recognizes that as a practical matter without the assistance of counsel, a convicted defendant would be hard-pressed to assemble into a single Crim. P. 35(b)

38

motion all of the legal arguments which might result in post-conviction relief."). As a result, Colorado courts have allowed defendants to file successive petitions after the denial of earlier petitions filed pro se. See, e.g., People v. Naranjo, 738 P.2d 407, 409 (Colo. Ct. App. 1987) ("[S]ince [the] defendant did not have legal representation during the course of his first Crim. P. 35(c) proceeding, he is not necessarily precluded from relying upon other grounds for relief in his present motion.").

As the state here acknowledges, see Aplt's Opening Br. at 30 n.7, another special circumstance that may warrant the consideration of a successive Rule 35 motion is the ineffective assistance of counsel in post-conviction proceedings. The Colorado Court of Appeals has held that the right to counsel in post-conviction proceedings includes the right to effective assistance of counsel under the standards established by the United States Supreme Court in Strickland, 466 U.S. at 690. See People v. Hickey, 914 P.2d 377, 379 (Colo. Ct. App. 1995). As a result, the Court of Appeals concluded, the failure to provide effective assistance of counsel in a post-conviction proceeding is tantamount to failing to provide counsel at all. See id. Hickey thus suggests that, like the complete absence of counsel in a post-conviction proceeding, ineffective assistance of counsel in such a proceeding may constitute a special circumstance that allows allow the court to consider a second or successive Colo. Crim. P. 35(c) motion. Id. But see People v. Goldman, 923 P.2d 374, 374-75 (Colo. Ct. App. 1996) (refusing to follow procedure adopted in Hickey--remanding Rule 35(c) proceeding to the trial court to consider claim

alleging ineffective assistance of counsel in the Rule 35(c) proceeding--because this claim was not first raised in the trial court).

In addition to the complete lack of counsel and ineffective assistance of counsel, the Colorado courts have suggested several other circumstances that may justify the consideration of successive post-conviction motions. For example, the announcement of a new legal principle after the first motion has been filed may warrant consideration of a successive motion. See People v. Allen, 843 P.2d 97, 101 (Colo. Ct. App. 1992) ("Because the defendant did not know of the changed double jeopardy legal standard when he filed his first Crim. P. 35(c) motion . . . his application for relief is not barred. . . ."), rev'd on other grounds, 868 P.2d 379 (Colo. 1994). The discovery of new evidence may also constitute a special circumstance justifying consideration of a successive motion. See Hubbard, 519 P.2d at 948.

In the instant case, Mr. Demarest has offered no explanation as to why his counsel in the Rule 35(c) proceeding in state court did not present the significant new evidence that was subsequently produced at the federal hearing. Accordingly, we are unable to determine from the record before us whether Mr. Demarest's failure to present this evidence in the state court proceedings was caused by the kind of "special circumstances," see Turman, 784 P.2d at 780; Scheer, 518 P.2d at 835, that would allow the filing of a second or successive post-conviction motion under Col. R. Crim. P. 35. (e.g., ineffective assistance of post-conviction counsel, the discovery of new evidence, or

a change in the law).  We note that the state has requested that we remand the case to the district court for a determination of whether Mr. Demarest's ineffective assistance of counsel claim based on the new evidence would be procedurally barred under Colorado law.  In light of the insufficient record before us, we agree that remand is warranted to address that issue.[6]

In the event that the district court finds that Mr. Demarest's ineffective assistance of counsel claim (based on the new evidence discussed above) would not be procedurally barred under Colorado law, it should dismiss the claim without prejudice so that it may now be adjudicated in the Colorado courts. Alternatively, in the event that the district court finds that Mr. Demarest's claim would be procedurally barred under Colorado law,

---

[6]        In his appellate brief, Mr. Demarest also argues that Colorado's procedural rules should not bar federal habeas relief here because they have not been applied regularly and consistently by the state courts.  See Aple's Br. at 36-37.  In order to preclude federal habeas review, a state's procedural bar rules must be both "independent" and "adequate."  See Steele v. Young, 11 F.3d 1518, 1521-22 (10th Cir. 1993).  A procedural bar rule is "independent" if it is based exclusively on state law.  See id. at 1521.  Although it is often difficult to determine whether a procedural bar rule is "adequate," we have concluded that "state procedural bar rules [are] inadequate to preclude federal review where the state court has not applied the bar 'strictly or regularly' to the type of claim at issue."  Id. at 1522 (citing Gutierrez v. Moriarty, 922 F.2d 1464, 1469-71 (10th Cir. 1991)).

Here, because the record does not indicate why Mr. Demarest did not present the testimony of Eileen Bausch, Mr. Davidson, and Drs. Vedeal, Kennedy, and Rehg in the initial state post-conviction proceedings, it is not clear whether Colorado's procedural bar rules will apply  to this case and, if they do apply, what particular rule will be triggered.  Accordingly, we leave for the district court on remand the determination, if relevant, of whether the particular Colorado procedural bar rules at issue, if any, are sufficiently "adequate" and "independent" to preclude a successive ineffective assistance of counsel claim based on the new evidence.

41

the district court should proceed to determine the federal question of whether there was cause for the default and actual prejudice resulting from a violation of federal law or whether a failure to consider Mr. Demarest's claim would result in a fundamental miscarriage of justice. See Breechen v. Reynolds, 41 F.3d 1343, 1353 (10th Cir. 1994).

### D. Cause and Prejudice; Fundamental Miscarriage of Justice

A federal court may proceed to the merits of a procedurally defaulted habeas claim if the petitioner establishes either cause for the default and actual prejudice or a fundamental miscarriage of justice if the merits of the claim are not reached. Klein v. Neal, 45 F.3d 1395, 1400 (10th Cir. 1995); Brecheen, 41 F.3d at 1353. The determination of cause and prejudice and of fundamental miscarriage of justice are both matters of federal law. See Murray v. Carrier, 477 U.S. at 478, 489 (1984); Klein, 45 F.3d at 1400.

Cause for a procedural default generally involves "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." Murray, 477 U.S. at 488. Cause may be established by showing that "the factual or legal basis for a claim was not reasonably available to counsel" or that there was "'some interference by officials that made compliance impracticable." Id. (quoting Brown v. Allen, 344 U.S. 443, 486 (1953)). However, ineffective assistance of counsel in the post-conviction proceedings does not constitute cause under federal law. See Coleman, 501 U.S. at 757 (1991) ("Because [petitioner] had no [federal constitutional] right to counsel

42

to pursue his appeal in state habeas, any attorney error that lead to the default of [his] claims in state court cannot constitute cause to excuse the default in federal habeas.").[7] If cause is established, the petitioner must then show that he suffered actual prejudice as a result of the alleged violation of federal law. See Klein, 45 F.3d at 1400; Brecheen, 41 F.3d at 1353.

Alternatively, a federal court may proceed to the merits of a procedurally defaulted claim if the petitioner establishes that a failure to consider the claim would result in a fundamental miscarriage of justice. See Klein, 45 F.3d at 1400; Breechen, 41 F.3d at 1353. To come within this "very narrow exception," Klein, 45 F.3d at 1400, the petitioner must supplement his habeas claim with a colorable showing of factual innocence. See id. Such a showing does not in itself entitle the petitioner to relief but instead serves as a "'gateway'" that then entitles the petitioner to consideration of the merits of his claims. Brecheen, 41 F.3d at 1357 (quoting Herrera v. Collins, 506 U.S. 390, 404 (1993)). In this context, factual innocence means that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup v. Delo, 513 U.S. 298, 327 (1995); see also Murray, 477 U.S. at 496 ("[W]e think

---

[7] As noted above, under Colorado law (which the district court should apply to determine whether Mr. Demarest's claim would now be procedurally barred), ineffective assistance of counsel in one collateral proceeding may authorize the filing of a second or successive proceeding. See Hickey, 914 P.2d at 379. In this respect, the Colorado law that the district court must initially apply in determining whether there is a procedural bar differs from the federal law that must be applied if the district court finds a procedural bar and is then required to proceed to a determination of cause and prejudice.

that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."). Factual innocence requires a stronger showing than that necessary to establish prejudice. Schlup, 115 S. Ct. at 867. "[T]he habeas court must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" Id. (quoting Judge Henry Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 160 (1970)).

Accordingly, on remand, in the event that the district court finds that Mr. Demarest's ineffective assistance of counsel claim based on the new evidence discussed above would be procedurally barred under Colorado law, it should then determine whether Mr. Demarest has established cause for the default and prejudice resulting from a violation of federal law or that a fundamental miscarriage of justice would result if his claim is not considered on the merits. In that event, if Mr. Demarest establishes either cause and prejudice or a fundamental miscarriage of justice, then the district court should grant his habeas petition.[8]

---

[8]     We note that although the state has challenged the district court's conclusion that Mr. Demarest has exhausted his state court remedies, it has not challenged the district court's conclusion on the merits that (in light of the new evidence)

44

## II. CONCLUSION

As the First Circuit has written:

The junction where federal habeas power intersects with state criminal processes is enswathed in a mutuality of respect between sovereigns. It is that principle of comity which underlies the federal courts' unwillingness to adjudicate too hastily matters of fundamental federal significance arising out of state prosecutions. Requiring that remedies be exhausted in state courts is merely comity's juridical tool, embodying the federal sovereign's respect for the state courts' capability to adjudicate federal rights.

---

Mr. Demarest received ineffective assistance of counsel in violation of the Sixth Amendment. "'[A] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.'" Capps v. Sullivan, 13 F.3d 350, 353 (10th Cir. 1993) (quoting Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 810 F.2d 243, 250 (D.C. Cir. 1987)). Accordingly, in the event that the district court concludes that Mr. Demarest's ineffective assistance of counsel claim (based on the new evidence) is procedurally barred but further finds either cause and prejudice or a fundamental miscarriage of justice, the district court's decision on the merits of Mr. Demarest's ineffective assistance of counsel claim will be the law of the case and his habeas petition should be granted.

We further note that in granting the writ, the district court imposed certain conditions. In particular, the court ordered Mr. Demarest's release upon either the expiration of sixty days from the entry of judgment or upon the commencement of state proceedings to retry him for Mr. Hyams's murder, whichever was earlier. The court also ordered Mr. Demarest released on bond under certain conditions. See id. at 1454-56.

In the event that the district court, through proceedings consistent with this opinion, again grants Mr. Demarest's petition (i.e., by finding procedural bar and cause and prejudice or a fundamental miscarriage of justice), the determination of the conditions on which the writ should be granted and of the conditions of Mr. Demarest's release will be a matter for the district court's discretion.

Finally, as the parties noted at oral argument, in light of its conclusion that he received ineffective assistance of counsel, the district court did not address Mr. Demarest's other claims. See Demarest, 905 F. Supp. at 1443, 1454. We leave it to the district court on remand to determine the appropriate disposition of these other claims.

45

Nadworny v. Fair, 872 F.2d 1093, 1096 (1st Cir. 1989) (citations omitted). In the instant case, that policy of comity, reflecting the mutuality of respect between state and federal courts, leads us to vacate an exceptionally well-reasoned opinion by the district court, one that forcefully expresses the fundamental importance of a defendant's Sixth Amendment right to effective assistance of counsel in a criminal proceeding. We stress that our opinion in this case should not be read in any way as a criticism of the district court's incisive analysis of the conduct of Mr. Demarest's trial counsel. Moreover, it is noteworthy that in this appeal the state has not sought to defend that conduct, and we find it difficult to imagine how that conduct might be characterized any differently than did the district court--objectively unreasonable and materially prejudicial to Mr. Demarest.

Nevertheless, these assessments of the conduct of Mr. Demarest's counsel, as strongly supported as they are, may only be reached by considering important evidence not presented to the state courts in the post-conviction proceedings: the new testimony of Ms. Bausch and Mr. Davidson, the strong scientific evidence offered in support of Mr. Demarest's defense by Dr. Kennedy, and the medical and psychiatric evidence from Drs. Vedeal and Rehg. Therefore, our respect for the state courts requires us to remand this case to the district court for a determination of whether this new evidence could now be presented in those courts. If Mr. Demarest's new evidence may still be presented in the Colorado courts, then it is those courts, rather than the federal court, that should have the opportunity to initially consider it. That conclusion follows directly from the Supreme

Court's statement that "'it would be unseemly'" in our dual system of government to allow a federal court to overturn a state court conviction without affording the state courts an opportunity to correct a constitutional violation.  See  Picard, 404 U.S. at 275 (quoting Darr, 339 U.S. at 204).[9]

Therefore, we first conclude that the interests of comity and federalism support our consideration of the state's failure-to-exhaust defense as to the new blood-spatter, medical, and psychiatric evidence offered by Mr. Demarest at the federal hearing.  Upon reviewing this new evidence, as well as the new evidence offered by Ms. Bausch and Mr. Davidson at the federal hearing, we further conclude that Mr. Demarest did not fairly present his ineffective assistance of counsel claim to the Colorado courts and that he therefore failed to exhaust his state remedies.  Accordingly, we vacate the decision of the district court and remand the case to the district court for a determination of whether  Mr. Demarest would now be procedurally barred under Colorado law from bringing an ineffective assistance of counsel claim based on the new evidence.

If the district court determines that Mr. Demarest's ineffective assistance of counsel claim would not be procedurally barred, then it should dismiss the claim without prejudice so that it can now be considered by the Colorado courts.  Alternatively, if the

---

[9]    In the event that Mr. Demarest's ineffective assistance of counsel claim is returned to the state courts, we note that the testimony of the witnesses at the federal district court hearing may in certain circumstances be admissible in the state court proceedings.  See Colo. R. Evid. 804 (b)(1) (establishing exception to hearsay rule for former testimony when declarant is unavailable).

district court finds that Mr. Demarest's claim would now be procedurally barred, it should then determine under the applicable federal law whether Mr. Demarest can establish cause and prejudice for the procedural default or, alternatively, whether a fundamental miscarriage of justice would result from the failure to consider the merits of the claim because Mr. Demarest has made a colorable showing that he is factually innocent of the murder of Mr. Hyams. If Mr. Demarest makes such a showing of cause and prejudice or a fundamental miscarriage of justice, the district court should grant Mr. Demarest's petition.

We therefore VACATE the district court's decision and REMAND the case to the district court for proceedings consistent with this opinion.